# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| AMERICAN CARTAGE, INC. | : | Case No. 03-44308-JBR |
| DEBTOR | : | |

## MEMORANDUM OF DECISION ON TRUSTEE'S MOTION FOR ORDER (A) FINDING THAT CHAPTER 7 TRUSTEE HAS EXCLUSIVE STANDING TO PROSECUTE CLAIMS BROUGHT BY CITY SANITATION, LLC AND (B) APPROVING AND AUTHORIZING SETTLEMENT AGREEMENT WITH ALLIED WASTE SERVICES OF MASSACHUSETTS, LLC

The Chapter 7 Trustee successfully moved to reopen the Debtor's bankruptcy to now seek approval of a settlement with Allied Waste Services of Massachusetts, LLC ("Allied"[1]), which is being sued by City Sanitation LLC ("City"). City opposes the settlement on the grounds that it, as the ultimate transferee of the Debtor's assets pursuant to a secured party sale, holds the claims against Allied; the Trustee and Allied allege that the claims belong to the bankruptcy estate.

## FACTS

In August 2002 Financial Federal Credit Inc. ("FFC") was granted a security interest in certain assets of the Debtor, including:

> all goods, inventory, equipment, accounts, accounts receivable, chattel paper, documents, instruments, contract rights, general intangibles, investment property, securities entitlements, deposit accounts, fixtures and other property, wherever located, now or hereafter belonging to [American] or in which [American] has any interest, and in all proceeds, insurance proceeds, substitutions, replacement parts, additions and accessions of and/or to all of the foregoing (collectively, the "Other Collateral").

---

[1] Allied also operates under the name BFI.

On July 23, 2003 the Debtor filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code. Shortly thereafter the Court approved the appointment of a Chapter 11 Trustee who retained William Zoll to assist in operating the business. At the request of the Chapter 11 Trustee, the Court approved the stipulation between the Debtor and FFC for the use of cash collateral. The stipulation lists FFC's collateral as several vehicles and assets whose description is identical to the description of the Other Collateral.

Efforts to reorganize the business were unsuccessful and the case was converted to Chapter 7. The Chapter 11 Trustee was appointed as the Chapter 7 Trustee. FFC obtained relief from stay to conduct a secured creditor sale of all of its collateral. The order granting relief from stay to permit the sale of the Other Collateral, however, was far more expansive in its description of the Other Collateral and inserted the following language not contained in the Security Agreement, UCC1, or the stipulation: "trade names, service names, service marks, telephone numbers, choses in action, vehicles [certain vehicles were actually covered and sold pursuant to an earlier order granting relief from stay]."

Todesca Equipment Co., Inc. ("Todesca"), which is alleged to be City's straw, was the successful buyer. The more expansive language included in the order granting relief with respect to the Other Collateral was carried forward into the Bill of Sale. City alleges that the assets were assigned to it but none of the parties provided a copy of the assignment. Allied alleges that, despite the fact that the State Court Complaint avers that a copy of the assignment is attached to the complaint as Exhibit F, no Exhibit F was ever filed and that Allied requests that City produce a copy of the assignment have gone

2

unanswered.

Subsequently, while the bankruptcy was still pending, City, without notice to the Chapter 7 Trustee, commenced a state court action against Allied and William Zoll, the former chief financial officer and manager of the Debtor, alleging conversion of the Debtor's assets, interference with contractual and advantageous relationships, breach of fiduciary duty against Zoll and civil conspiracy.[2] City's counsel in bringing the state court action was the Debtor's bankruptcy counsel.

The State Court Complaint is premised on the allegation that "[a]ll of the assets of American, including without limitation customer lists, contract rights, and choses in action, were subject to perfected security interest granted by American to Financial Federal Credit."[3] The State Court Complaint, however, is replete with references to the harm caused to the *Debtor and its estate.* For example, the complaint alleges that during the pendency of the Chapter 11, Zoll, who was retained by the Chapter 11 Trustee, "engaged in a systematic manner to divert assets of American to his own benefit and to conceal such diversion from the Chapter 11 Trustee and from the Bankruptcy Court."[4] Among the specific allegations are that Zoll allegedly collected some of the Debtor's receivables and converted them for his personal use, and caused the Debtor to pay for goods and services used by individuals not employed by or

---

[2] The count alleging a RICO violation was dismissed.

[3] State Court Complaint at ¶ 7, attached as Exhibit C to the Trustee's Motion for Order (A) Finding That Chapter 7 Trustee Has Exclusive Standing to Prosecute Claims Brought by City Sanitation, LLC and (B) Approving and Authorizing Settlement Agreement with Allied Waste Services of Massachusetts, LLC.

[4] State Court Complaint at ¶ 24.

3

affiliated with the Debtor;[5] that Zoll attempted to sell and did in fact sell certain portions of the Debtor's business and customers, outside of the bankruptcy to a third party, Waste Solutions, Inc. ("WSI"), in return for which he allegedly received cash and a salaried position for a "confederate."[6] Allegedly when WSI learned of the Debtor's bankruptcy it stopped servicing the Debtor's customers and terminated Zoll's confederate.[7] Further examples of the alleged harm to the Debtor and its estate include City's assertions that Zoll tried unsuccessfully to sell customer lists, contract rights, and other assets to Waste Transport Services, Inc. ("WTS") but claims that WTS used information obtained from Zoll to "to obtain for [WTS's] own account the contracts, customers, contract lists, and equipment which Zoll had offered to sell...."[8] Indeed in the State Court Complaint, City identifies itself as the "successor-in-interest to American Cartage, Inc."[9]

Finally the State Court Complaint alleges that Zoll and Allied acted in concert to divert the Debtor's customers to Allied. City alleges, upon information and belief, that Zoll was paid a commission for each customer diverted to Allied and that he was ultimately hired by Allied. According to City, trash containers bearing the Debtor's logo

---

[5] *Id.*

[6] *Id.* at ¶ 32.

[7] *Id.* at ¶ 34.

[8] *Id.* at ¶ 37. The State Court Complaint also alleges that City has "obtained a final, non-appealable judgment against WTS and [its principal] for conversion of some of American's assets. *Id.* at ¶ 38.

[9] *Id.* at ¶ 4.

4

were removed and replaced with Allied's containers and that the Debtor's containers were never returned to the Debtor. It is unclear if these containers are among the equipment that City avers was in the possession of the Debtor's customers and taken by Allied.

**POSITION OF THE PARTIES**

The Trustee argues that the estate owns whatever claims exist against Allied since FFC's security interest did not include commercial tort claims or other causes of action, choses in action, or litigation claims. Because City is seeking damages for alleged harm caused to the Debtor and its estate by Allied during the course of the bankruptcy, the Trustee asserts that the post-petition claims belong only to the estate and that he is the only party with standing to pursue these generalized business claims. He also objects to City's standing on equitable grounds that City's insiders are the Debtor's ousted insiders and that it would be unfair to permit them to benefit at the expense of the estate's creditors. The Trustee finally argues that FFC was paid in full so it suffered no harm and thus had no damages to pursue. Not surprisingly, Allied filed a memorandum in support of the Trustee's position for the same reasons as set forth in the Trustee's memorandum.

City attempts to distinguish the claims at issue from commercial tort claims by alleging that the claims are proceeds of the collateral it purchased. It argues that the harm is not to the estate but to FFC's collateral and that as the purchaser of the collateral, those claims belong now belong to it. City also argues that choses in action existed when the foreclosure occurred and were expressly part of FFC's collateral. Thus City posits that the Court permitted the sale of the causes of action as part of the

bankruptcy sale. In City's view the after-acquired clause of the security agreement would also include the causes of action that arose after FFC's security interest was granted. Finally it argues that, pursuant to 11 U.S.C. § 554(c), the Chapter 7 trustee abandoned the claims when the case was previously closed.

In advocating for the approval of the settlement, the Trustee asserts that it satisfies the test adopted in *Jeffrey v. Desmond*, 70 F.3d 183, 185 (1st Cir. 1995) because, among other things, it will permit the remaining unpaid administrative and priority claims to be paid in full and will yield a distribution to unsecured creditors. Moreover the Chapter 7 Trustee to believe his probability of success on the merits of the claims against Allied is very low, especially in light of his post-conversion acquiescence to Allied's serving the Debtor's customers to prevent those entities from running afoul of local health ordinances causes.

Allied urges disposal of the objection on the grounds that City lacks standing. According to Allied, City has not demonstrated it even owns the any of the assets sold to Todesca and more importantly, City is not a creditor. City alleges that the assets were transferred to it but none of the parties provided a copy of the transfer documents.

City responds that the settlement of claims against Allied for $12,000 is significantly less than the claims are worth. Unlike the Chapter 7 Trustee's assessment of the likelihood of success on the merits, City's assessment is that the issues are not complex, that the Trustee has not examined any of the documents relevant to the claims nor has he talked to City or its counsel about the claims.

6

**DISCUSSION**

*The Alleged Security Interest*

"[I]n the absence of statutory restrictions, the rights of the parties to secured transactions are controlled by the agreement between them." *Mechanics Nat. Bank of Worcester v. Killeen,* 377 Mass. 100, 108, 384 N.E.2d 1231, 1236 (1979). Although the order granting FFC relief from the automatic stay and sale order added the words "choses in action" to the property for which relief was granted, the order granting relief expressly provided that relief was grant "so that FFCI may enforce all of its rights under its security interest...." Because a secured creditor can only sell and deliver title to those assets in which it had a valid security interest in a secured creditor's sale, the Court must examine the security agreement by which FFC acquired its interest in the Other Collateral.

The security agreement creating FFC's interest in the Other Collateral did not include a security interest in "choses in action" and thus the addition of the language "choses in action" to the order granting relief and the bill of sale does not put otherwise excluded assets in the collateral pool. City's argument that a security interest in choses in action was acquired by virtue of the cash collateral orders ignores the fact that the replacement liens were ordered "in the same collateral and same priority as currently exists...." Therefore FFC did not have a security interest in choses in action and Todesca thus could not have purchased choses in action.

Even if FFC had a security interest in choses in action, the description "choses in

7

action" is legally insufficient, as would the description "general intangibles,"[10] if the claims are commercial tort claims. Whether the claims are proceeds of the collateral which City acquired or commercial tort claims is governed by the Massachusetts Uniform Commercial Code. FFC's security interest in the Other Collateral arose under a security agreement executed in 2002 and thus it is governed by what is still referred to as "new" Article 9. M.G.L. c. 106A § 9-101 *et seq.* Article 9 exempts certain property from the definition of accounts. M.G.L. c. 106 § 9-102. Commercial tort claims are one such exemption. M.G.L.c. 106 § 9-102(13) defines a commercial tort as

> a claim arising in tort with respect to which:
>
> (A) the claimant is an organization; or
>
> (B) the claimant is an individual and the claim:
>
> (i) arose in the course of the claimant's business or profession; and
>
> (ii) does not include damages arising out of personal injury to or the death of an individual.

FFC, which City now argues was the owner of the claims, Todesca, the purchaser, and City, the purported transferee, and the Debtor itself are all corporations and thus organizations as that term is used in § 9-102(13) . *Shirley Medical Clinic, P.C. v. U.S.*, 446 F. Supp.2d 1028, 1034 (S.D. Iowa 2006). If City were to change its position again and now argue that its claims somehow flowed through the Trustee when he allegedly abandoned them, the outcome would be the same. Whether the Chapter 7 Trustee is

---

[10] "One form of intangible property is a 'chose in action,' which in its classic sense is a legal claim, that is, something on which an 'action' (a lawsuit) might be founded, such as a right to recover a debt." *GP Credit Co., LLC v. Orlando Residence, Ltd.*, 349 F.3d 976, 980 (7th Cir. 2003).

8

viewed as an "organization" because he is the estate representative or seen as an individual who suffered harm as a result of the operation of a business, the acts of which City now complains are commercial tort claims.

Generic descriptions are insufficient to grant a security interest in commercial tort claims, as are descriptions by type. M.G.L.A. 106 § 9-108(e)(1). In *Shirley Medical Clinic* the court found that a financing statement covering "proceeds from any lawsuit due or pending" was insufficient. As Comment 5 § 9-108 notes:

> Subsection (e) requires greater specificity of description in order to prevent debtors from inadvertently encumbering certain property. Subsection (e) requires that a description by defined "type" of collateral alone of a commercial tort claim or, in a consumer transaction, of a security entitlement, securities account, or commodity account, is not sufficient. For example, "all existing and after-acquired investment property" or "all existing and after-acquired security entitlements," without more, would be insufficient in a consumer transaction to describe a security entitlement, securities account, or commodity account. The reference to "*only* by type" in subsection (e) means that a description is sufficient if it satisfies subsection (a) and contains a descriptive component beyond the "type" alone. Moreover, if the collateral consists of a securities account or commodity account, a description of the account is sufficient to cover all existing and future security entitlements or commodity contracts carried in the account. See Section 9-203(h), (i).
>
> Under Section 9-204, an after-acquired collateral clause in a security agreement will not reach future commercial tort claims. It follows that when an effective security agreement covering a commercial tort claim is entered into the claim already will exist. Subsection (e) does not require a description to be specific. For example, a description such as "all tort claims arising out of the explosion of debtor's factory" would suffice, even if the exact amount of the claim, the theory on which it may be based, and the identity of the tortfeasor(s) are not described. (Indeed, those facts may not be known at the time.)

Thus the relevant security agreement did not grant FFC an interest in the Debtor's commercial tort claims by use of such words as "accounts," general intangibles" and the

9

like.

City, latching on to the last sentence of comment 5g of § 9-102 ,[11] argues that its claims are the proceeds of its collateral.[12] This argument is incorrect for several reasons.

Proceeds are defined in (64) of § 9-102 as follows:

> (A) whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral;
>
> (B) whatever is collected on, or distributed on account of, collateral;
>
> (C) rights arising out of collateral;
>
> (D) to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral; or
>
> (E) to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral.

While proceeds received as compensation for harm suffered to collateral, such as insurance proceeds for damage to a vehicle, are within the scope of proceeds of the

---

[11] Comment 5g to § 9-102 provides:
"Commercial tort claim." This term is new. A tort claim may serve as original collateral under this Article only if it is a "commercial tort claim." See Section 9-109(d). Although security interests in commercial tort claims are within its scope, this Article does not override other applicable law restricting the assignability of a tort claim. See Section 9-401. A security interest in a tort claim also may exist under this Article if the claim is proceeds of other collateral.

[12] Specifically City argues that the causes of action are the proceeds of the Debtor's accounts, equipment, contracts and contract cash proceeds, and general intangibles. The definitions of accounts and general intangibles expressly exclude commercial tort claims. It then argues that the claims are the proceeds of customer lists and cash and cash equivalents.

collateral, allegations of generalized harm to a business are not. Interpreting such litigation as proceeds of collateral is the exception that would swallow the rule. The more specific definition of commercial tort claim will govern over the more general description of proceeds. See In re Zych, 379 B.R. 857 (Bankr. D. Minn. 2007).

Moreover Subsection (D) includes in the definition of proceeds "claims arising out of the loss, nonconformity, or interference" with the collateral but such claims are only proceeds "to the extent of the value of the collateral." FFC's debt was paid in full from the proceeds of the sale. "The claim of a secured creditor to the proceeds of collateral cannot exceed the value of the collateral." Helms v. Certified Packaging Corp., 551 F.3d 675, 679 (7th Cir. 2008). Therefore, even if somehow the alleged general harm to the Debtor's business could be considered "proceeds," the value of the collateral, which in this case was coextensive with the amount owed FFC, has already been paid in full.

Comment 15 of M.G.L. c.106 § 9-109 ("no security interest attaches under an after-acquired property clause to a tort claim. See Section 9-204(b)") disposes of City's argument that grant of a security interest in property acquired after the execution of the security instruments is a basis for finding City owns the causes of action.

Moreover City lacks standing to bring the state court action as the buyer of the Other Collateral because the acts complained of diminish the estate generally. They are not injuries to City's collateral. Indeed City's own allegations in the State Court Complaint admit as much. Therefore the Chapter 7 Trustee is the party with standing to sue. Lopez-Stubbe v. Rodriquez-Estrada (In re San Juan Hotel), 847 F.2d 931, 938 (1st Cir. 1988).

11

*Abandonment of Property of the Estate*

City's argument that the Trustee has abandoned the cause of action upon the closing of the case is also unavailing. Property of the estate includes "[a]ny interest in property that the estate acquires after the commencement of the case." 11 U.S.C. § 541(a)(7). The causes of action arose during the Chapter 11 and belong to the estate. Section 554 provides in pertinent part:

> (c) Unless the court orders otherwise, any property that is scheduled under section 521(1) of this title and that is not administered before a case is closed under section 350 of this title is deemed abandoned.
>
> (d) Unless the court orders otherwise, property of the estate that is not abandoned under subsection (b) or (c) of this section and that is not administered in the case remains property of the estate.

While ordinarily assets not otherwise administered are deemed abandoned, one obvious exception is that property that is not scheduled is not deemed abandoned. The causes of action against Allied and Zoll were not scheduled; indeed they could not have been without amending the schedules to note the existence of the claims. But according to City, the causes of action were kept secret from the Trustee so he lacked the requisite knowledge to amend the schedules to include these causes of action. Thus the causes of action were not deemed abandoned when the case was previously closed. Additionally "once a case is reopened, the original case is revived, including all procedural and substantive rights of the debtor and presumably the trustee.... reopening and thereby reviving a debtor's case would effectively negate any technical abandonments which may have occurred when the case was originally closed." *In re Shelton*, 201 B.R. 147, 155 (Bankr. E.D.Va.1996).

12

*The Settlement Agreement*

City has not demonstrated that it has standing to object to the settlement. Although the assignment of assets purchased by Todesca is questionable, in any event City is not a creditor of the estate. Nevertheless the Court has an obligation to determine whether the proposed settlement should be approved, a decision that is placed within the sound discretion of the Court. *Jeffrey*, 70 F.3d at 185.

The well known test set forth in *Jeffrey* continues to be the test against which compromises are measured. The four factor test requires examination of

> (i) the probability of success in the litigation being compromised;
> (ii) the difficulties, if any, to be encountered in the matter of collection;
> (iii) the complexity of the litigation involved, and the expense, inconvenience and delay attending it; and,
> (iv) the paramount interest of the creditors and a proper deference to their reasonable views in the premise.

*Id.* "The court's consideration of these factors should demonstrate whether the compromise is fair and equitable, and whether the claim the debtor is giving up is outweighed by the advantage to the debtor's estate." *Jeremiah v. Richardson*, 148 F.3d 17, 23 (1st Cir. 1998). The Court is not to substitute its judgment for the Trustee but only to weigh whether the Trustee's judgment satisfies the lowest threshold of reasonableness. *Moorhead v. Burdick (In re Moorhead )*, 208 B.R. 87, 89 (1st Cir. BAP 1997), aff'd 201 F.3d 428 (1st Cir. 1998).

In this instant case, the Trustee was the ultimate party responsible for operating the Debtor's business. He retained Zoll and it was on the trustee's motion that the case was converted to Chapter 7. The Trustee has stated that he believes the allegations

13

against Zoll and Allied are unfounded. He believes that Allied, with his knowledge, stepped in to fill the Debtor's customers' needs for trash pick up on a regular basis to avoid the customers' violating various health ordinances.

Moreover the Trustee has no funds in the estate with which to undertake an action against Allied. Although trustees can and do pursue claims that will yield a recovery for the estate in no-asset cases, a trustee should not be compelled to forego settlement and pursue claims he believes will yield little or no benefit to creditors.

That City received a judgment against WSI, a judgment that may in fact belong to the estate, does not undermine the settlement. City has not proffered any evidence as to whether the judgment was entered by default, whether it was a result of an agreement between City and WSI, or even the amount of the judgment.

In light of the difficulty the Trustee believes is inherent in obtaining a judgment against Allied, the estate's lack of funds to finance such litigation, and the fact that the settlement will permit administrative and priority claims to be paid in full and still yield a distribution to unsecured creditors, the Trustee has meet his burden of satisfying the *Jeffrey* test.

**Conclusion**

For the reasons set forth herein, the Trustee's Motion [#318] is GRANTED.

A separate Order will issue.

Dated: December 10, 2009

Joel B. Rosenthal
United States Bankruptcy Judge

14

15

Case 03-44308 Doc 348 Filed 12/11/09 Entered 12/11/09 10:52:51 Desc Main
Document Page 15 of 15